# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

JANE DOE 1 and JANE DOE 2, on behalf
of themselves and all similarly situated
women,

                    Plaintiffs,

                                                    15 CV 03849 (AKH)

-against-

THE CITY OF NEW YORK and BENNY
SANTIAGO,

                    Defendants.

## DECLARATION OF LETITIA JAMES, PUBLIC ADVOCATE
## FOR THE CITY OF NEW YORK

I, Letitia James, Public Advocate for the City of New York and an attorney licensed in the State of New York, pursuant to 28 U.S.C. §1746, declare as follows:

1. I submit this Declaration in support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel in the above-referenced matter. Unless stated otherwise, the facts stated herein are of my own personal knowledge and if called as a witness I could competently testify thereto.

2. I submit this declaration in support of the motion for class certification by the Plaintiffs in this action, women who suffered rape and other sexual abuse in our City's jails, and all similarly situated women, inclusive of women who will be affected in the future by the City policies that are described in the Complaint.

3. The following exhibits are annexed to my declaration: (1) Department of Health and Mental Hygiene's ("DOHMH") Sexual Abuse Quarterly Report Summaries for 2014, (2) DOHMH Sexual Abuse Quarterly Report Summaries for 2015 to date, (3) Department of Correction's ("DOC") Compstat Report, (4) DOC's Prison Rape Elimination Act ("PREA") Data, and (5) Public Advocate's April 2015 Petition to the Board of Correction to engage in rule-making under the City's Administrative Procedures Act ("CAPA") to establish local rules that

will protect detainees and inmates from rape and sexual abuse within the City jails ("April 2015 Petition").

## Background: The Oversight Role of the Public Advocate

4.  The Office of the Public Advocate for the City of New York is a citywide elected position in New York City, which serves as a direct link between the electorate and city government, effectively acting as an ombudsman, or "watchdog," for New Yorkers by providing oversight for city agencies, investigating and resolving citizens' complaints about city services, and making proposals to address perceived shortcomings or failures.

5.  As Public Advocate, I have introduced legislation including, in relevant part, rules and laws that would combat rape on college campuses and I have created proposals requesting that the state set aside $5.8 million in the state budget for rape prevention and sexual assault victim services, and that the city invest an additional $900,000 in forensic centers in the Bronx and Brooklyn.

6.  Sexual abuse in jails and prisons is a nationwide problem. Preventing sexual abuse in our city jails is a moral and legal imperative. For years, the problems of rape, sexual harassment, and sexual coercion[1] on Rikers Island have not received necessary attention. For this reason, I petitioned the Board of Correction ("BOC") to engage in rule-making under CAPA to establish local rules that will protect detainees and inmates from rape and sexual abuse.[2]

---

[1] Staff sexual relations with inmates are defined as a criminal offense under New York law. Penal Law 130.05(3)(f) states that the statutory rape provision covers any person "committed to the care and custody of a local correctional facility and the actor is an employee, not married to such person, who knows or reasonably should know that such person is committed to the care and custody of such facility."

[2] Local rules are needed because the federal law, PREA, lacks enforcement hooks for the local jails. The plain language of the PREA standards covers local jails, however, when the states certify to the federal government that they are in "compliance" with PREA in order to retain federal funding, they do not need to include information about local jail compliance. The standards say the governor's certification applies only to "facilities under the operational control of the State's executive branch.". 28 C.F.R. § 115.501(b). This includes "facilities operated by private entities on behalf of the State's executive branch," *id.*, but it does not include local government entities that house state inmates. The DOJ summary explains that the governor's "certification, by its terms, does not encompass facilities under the operational control of counties, cities, or other municipalities." 77 Fed. Reg. 37106, 37115.

2

7.  The proposed rules for the BOC would affect the operation of DOC and DOHMH and their partners in providing medical care.[3] I am collaborating with the BOC to develop these new rules.

### DOC has responsibilities under the City Charter to provide care for inmates

8.  The Commissioner of DOC has the responsibility for the care of detainees and inmates who are in city custody.

9.  Chapter 25 § 623-5[4] of the New York City Charter established the DOC and assigned the Commissioner various powers and duties. It sets forth, in relevant parts, that the Commissioner has:

> (3) Charge and management of persons or any other institution of the city placed under his jurisdiction by law.
>
> (4) All authority, except as otherwise provided by law, concerning the care and custody of felons, misdemeanants and violators of local laws held in the institutions under his charge.

§ 623 (3)-(4).

10. Webster's Dictionary defines "care" to mean "effort made to do something correctly, safely, or without causing damage; things that are done to keep someone healthy, safe, etc.; things that are done to keep something in good condition."

11. The scope and meaning of the Commissioner's City Charter duties with regard to the care of detainees and inmates can be viewed against the backdrop of what New York state law requires of him. NY Correction Law, Art. 20, § 500-c (4) requires as follows:

> Custody and control of prisoners. ... The chief administrative officer [defined as Commissioner for NYC, and sheriff in other counties] shall receive and *safely* keep in the county jail of his county each person lawfully committed to his custody pursuant to the provisions of sections five hundred-a and five hundred four of this article and any other applicable provisions of law. (Emphasis supplied.)

12. Additionally, the Correction Law specifically prohibits degradation and assault of detainees and inmates. Art. 6, § 137 (5) mandates:

---

[3] DOHMH previously contracted with Corizon, a nationwide for-profit corporation to provide health care to inmates. That contact is over, and New York City's Health and Hospitals Corporation (NYCHHC) is now delegated this task.
[4] Section 624 and 625 are not relevant, as they concern operation of the buildings and use of prison labor.

3

> No inmate in the care or custody of the department shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self-defense, or to suppress a revolt or insurrection.

This section is applicable to both state prisons and local jails. Art 20, § 500-k.

13. There is no doubt that pursuant to New York State law the detainees and inmates in our city's jails are owed a duty of protection against rape and other sexual abuse.

### The putative class members, women subjected to rape and sexual abuse in city jails, are numerous.

14. Based on my office's investigation and research, including interviews with formerly incarcerated women, health care staff for NYC jails, advocates who work with women on jail and re-entry issues, and experts in the area of correction, I believe the putative class members are numerous and representative of a class. In fact, as I discuss below, the data received from city agencies indicates that women are under-reporting rape and sexual abuse.

15. Due to lack of transparency and a patchwork of local data, we have an imprecise sense of the number of women who have been subjected to sexual abuse in NYC jails. But we know the number is too large. Data gathered by the United States Department of Justice (DOJ)[5] shows that Rikers Island inmates, and particularly female detainees and inmates held in City custody at Rose M. Singer Center (RMSC) at Rikers Island, reported experiencing high rates of sexual victimization[6] compared to jails nationwide. Although nationwide 3.2 % of jail inmates reported sexual victimization, at RMSC the rate was an alarming 8.6%.[7] And 5.9% of the RMSC inmates reported being subjected to staff sexual misconduct.[8]

16. The City's own data, compared with this federal survey, suggests that women are under-reporting sexual abuse to staff in our jails. Experience in this field teaches that the data we

---

[5] PREA requires the Department of Justice (DOJ) to conduct statistical reviews of prison rape allegations.
[6] Victimization is defined by DOJ here as "all types of sexual activity, e.g., oral, anal, or vaginal penetration; hand jobs; touching of the inmate's buttocks, thighs, penis, breasts, or vagina in a sexual way; abusive sexual contacts; and both willing and unwilling sexual activity with staff." *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-2012, Allen J. Beck PhD., NCJ 241399, Office of Justice Programs, Bureau of Justice Statistics, published May 2013.
[7] *Sexual Victimization in Prisons and Jails Reported by Inmates*, at Appendix Table 5, page 71.
[8] Staff sexual misconduct is defined by DOJ here as "includes all incidents of willing and unwilling sexual contact with facility staff and all incidents of sexual activity that involved oral, anal, vaginal penetration, hand jobs, blow jobs, and other sexual acts with facility staff." *Id.*, and see table 4, page 13.

have may be the tip of the iceberg due to fear of reporting, which I will discuss later in this declaration.

17. Notably, many of these women are pre-trial detainees who have either been remanded by a judge during the pendency of their case or simply cannot afford to make bail. Women who are subjected to any form of abuse while incarcerated undoubtedly lose faith in the fairness of our justice system.

***According to the most recent DOJ data, 5.9% of the approximately 815 women detained in 2012 (or 48 women) reported staff sexual misconduct.***

18. Sexual misconduct by staff in prisons and jails is likely a very under-reported crime. U.S. DOJ, *Regulatory Impact Assessment for PREA Final Rule*, at 17-18 (May 17, 2012), *available at* http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf. DOJ concluded based upon a nationwide survey that between 69 percent and 82 percent of inmates who reported sexual abuse in response to the survey had likely never reported an incident to corrections staff.

19. The most recent national Department of Justice (DOJ) survey data[9] shows that the Rose M. Singer Center (RMSC) (the jail on Rikers Island which houses female detainees and inmates) has a higher than usual number of rape and sexual abuse allegations.

20. RMSC and Otis Bantum Correctional Center (OBCC) (a male facility also on Rikers Island) both make the list of the twelve jail facilities with "high rates of staff sexual misconduct" nation-wide.[10] RMSC was one of only nine jails in the country that DOJ labeled as "facilities with high rates of inmate-on-inmate sexual victimization".[11]

21. For the year covered by the federal survey:
- 5% of inmates at RMSC were subjected to inmate-on-inmate sexual abuse
- 5.9% of inmates at RMSC were subjected to staff sexual misconduct
- 5.6% of inmates at RMSC were pressured by staff to engage in sexual activity
- 2.3% of inmates at RMSC were physically forced by staff to engage in sexual activity.

---

[9] *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-2012, Allen J. Beck PhD., May 2013, NCJ 241399, Office of Justice Programs, Bureau of Justice Statistics, page 8. Not every jail facility in the country was surveyed, a sampling technique was used.
[10] *Id.* at page 13.
[11] *Id.* at page 12.

5

22. Notably, according to the anonymous federal survey, sexual victimization[12] rates were also higher at RMSC's compared to other surveyed[13] buildings on Rikers Island where the men are held:

- New York City Anna M. Kross Ctr. (AMKC)         5.6 %
- New York City George Motchan Det. Ctr. (GMDC)   5.3 %
- New York City Otis Bantum Corr. Ctr. (OBCC)     6.2 %
- New York City Robert N Davoren Complex (RNDC)   3.4 %
  (split juvenile and adult population)
- New York City Rose M. Singer Ctr.               8.6 %
  (women)

23. The survey data gives us the ability to estimate the number of women affected. The average number of women detained in our city's jails is depicted in the table below.[14]

| Year | Annual average daily population at RMSC | Annual average daily population for entire jail system |
|---|---|---|
| 2012 | 815 | 12,078 |
| 2013 | 785 | 11,687 |
| 2014 | 742 | 10,909 |

24. Working from the 2012 DOJ survey figures, approximately 48 women reported experiencing at least one incident of staff sexual misconduct in 2012, 46 were pressured into some sexual activity by staff, and 19 were physically forced into sexual activity by staff. Because detainees at RMSC are a transient population, the survey is only a snapshot of the women who were in the jail during the survey and does not reflect the total number of women who experienced staff sexual abuse in 2012, nor can it reflect the women who may be subjected to harm in the future.

---

[12] Includes "all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter."

[13] Only the five facilities on Rikers that are listed here were part of the survey; other facilities on Rikers were not part of the survey.

[14] Data obtained from the Board of Correction (BOC), as reported by the Department of Correction (DOC).

6

*New York City data suggests women are under-reporting and there is inconsistency in government reporting.*

25. The city data appears to be internally inconsistent, and it should not be. DOHMH and DOC each have responsibilities to serve the entire jail population, and both agencies receive allegations from inmates. DOC has the responsibility to investigate the allegations and make findings, both for the safety of the inmates and to determine if their staff should be disciplined.[15] For that reason, DOHMH transmits all allegations to DOC for investigation.

26. The DOHMH and DOC data reports that have been provided to my office do not match up, and the Compstat[16] data from DOC does not include most rape allegations.

27. According to DOHMH and DOC, the following system-wide allegations were made in NYC jails in the previous three calendar years:

| DOHMH Total Allegations of Sexual Abuse[17] | | | |
|---|---|---|---|
| Year | Sexual Harassment | Sexual Assault | Total |
| 2012 | 14 | 90 | 104 |
| 2013 | 17 | 131 | 148 |
| 2014 | 9 | 107 | 116 |

---

[15] Under PREA, DOC must convene an interdisciplinary team to review each case, inclusive of health providers. See, 28 C.F.R. Part 115, § 115.86 Sexual abuse incident reviews.

[16] Compstat is a performance management system used to reduce crime. "The most widely recognized element of Compstat is its regularly occurring meetings where department executives and officers discuss and analyze crime problems and the strategies used to address those problems.... [it has] four principles ... accurate and timely intelligence, effective tactics, rapid deployment, and relentless follow-up." *Compstat: Its Evolution, Origins, and Future in Law Enforcement Agencies*, Bureau of Justice Assistance and Police Executive Research Forum, 2013.

[17] All sexual abuse, harassment and sexual assault data in the above chart represent alleged incidents that are communicated to health staff by patients. The health service does not collect information on whether these incidents are confirmed or substantiated by DOC. Definitions for the DOHMH table above are as follows: sexual abuse is sexual assault and sexual harassment; sexual assault involves any form of touching or penetration (i.e., vaginal, rectal, oral penetration with penis, finger or foreign objects); and sexual harassment is conduct that does not involve any form of touching.

7

| DOC Total Allegations of Sexual Abuse | | | |
|---|---|---|---|
| Year | Sexual Harassment | Sexual Abuse/ Misconduct | Total |
| 2012 | 13 | 84 | 97 |
| 2013 | 14 | 105 | 119 |
| 2014 | No data provided | | |

| DOC Compstat Report[18] | | | |
|---|---|---|---|
| Year | Misdemeanor sex crime | Rape | Total |
| 2014 | 2 | 0 | 2 |

28.    The anonymous federal survey yielded much higher numbers than have been reported by city agencies.

29.    The DOHMH data from 2014 shows that nine female inmates complained of sexual abuse to their medical provider, thirty-four transgender inmates made such complaints (gender identification is not specified in the data for the transgender inmates), and 73 men made such complaints. From January to June 2015, nineteen women reported sexual abuse to their medical providers, twice the number from the entire year of 2014.

30.    In addition to the variance between the federal data and the DOHMH data, there is a more alarming discrepancy between the DOHMH and DOC locally collected data. Note that in 2013, a year in which I received data from both agencies, they report very different numbers. DOHMH medical providers received 148 complaints system-wide, and transmitted them all to DOC via a Uniform Notification, so that DOC could investigate the allegations.[19]

31.    DOC on the other hand, reports receiving a total of only 119 complaints that year. At least 29 DOHMH reports to DOC are missing. This cannot be explained by the absence of inmate-on-inmate harassment allegations in the data DOC provided my office with, because only five of DOHMH's reports involved inmate-on-inmate harassment.

---

[18] DOC began separately reporting Compstat crime statistics in 2014. Prior to that, their data was presumably included among the New York City Police Department statistics.
[19] DOHMH staff advised our office that DOC does not update DOHMH on the progress or outcomes of the cases.

32. DOC is the agency with responsibility under PREA for collecting data,[20] and DOC can receive reports from many sources. They may receive reports from the health service, directly from inmates, from DOC staff, from Department of Education (DOE) staff, and others.

33. It is inexplicable why the data reported by DOC is much lower than data from DOHMH. We found a similar problem in the 2012 data, where DOHMH reported 104 allegations but DOC only reported 97.

34. The DOC Compstat data shows 0 rape allegations in 2014. As I will explain further below, there were a great many more than 0 allegations that year. DOHMH reported 47 allegations of rape or other penetration to DOC in 2014. **It is unclear whether DOC's Compstat reporting only includes those rapes forwarded to the authorities for investigation and prosecution, and DOC may have used the substantiation process as a screen for which cases to report to the police, or whether it reflects some other category of rape allegations. This should be explored.**

***DOHMH data shows that DOC staff is alleged to have abused inmates at an alarming rate.***

35. Of the total sexual abuse complaints reported to health providers by inmates in recent years, the majority of complaints were made against DOC staff.



---
[20] 28 C.F.R. Part 115, § 115.87 Data collection.

9



36. Of the allegations of sexual abuse by DOC staff, many appear to be linked to uses of force by staff, and body cavity searches.





*Low substantiation rates are indicative of a consequential problem.*

37. DOC data suggests a persistent problem of sexual allegations exists. The following table of data represents the total number of sexual abuse complaints, according to DOC, and not segregated by gender:

| PREA CATEGORY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| STAFF-ON-INMATE | 28 | 39 | 38 | 35 | 87 | 77 | 88 |
| STAFF SEXUAL MISCONDUCT | 18 | 28 | 33 | 27 | 83 | 64 | 74 |
| STAFF SEXUAL HARASSMENT | 10 | 11 | 5 | 8 | 4 | 13 | 14 |
| INMATE-ON-INMATE | 10 | 13 | 7 | 19 | 24 | 20 | 31 |
| NONCONSENSUAL ACT | 6 | 11 | 6 | 9 | 15 | 15 | 18 |
| ABUSIVE SEXUAL CONTACT | 4 | 2 | 1 | 10 | 9 | 5 | 13 |
| TOTALS | 38 | 52 | 45 | 54 | 111 | 97 | 119 |
| TOTAL SUBSTANTIATED | 0 | 0 | 0 | 3 | 3 | 2 | 3 |

38. New York City DOC substantiates claims of sexual abuse at startlingly low rates. According to the DOC reported numbers, the substantiation rate by DOC for all types of sexual

11

misconduct, inclusive of both inmate-on-inmate and staff-on-inmate incidents, was merely 2.5% in 2013; 2% in 2012; and 2.7% in 2011. This is a very low rate.

39. To put this rate in context, the Texas prison system was chosen for a study in 2006 because it had one of the lowest substantiation rates in the country – less than 3% – just slightly higher than DOC's.[21] In 2006, by contrast, the national substantiation rate was reported as 17%.[22] In 2007-2008, the national rate of substantiation was 13%.[23] In 2011, the national rate was 10%.[24]

40. The PREA Commission Report shines light on substantiation rates: "An 'unsubstantiated' finding may be the result of a poor-quality investigation or reflect the legitimate difficulty of gathering sufficient evidence. Whatever the cause, *the high proportion of unsubstantiated allegations—coupled with a failure to understand the difference between "unsubstantiated" and "unfounded"*[25]*—can lead legislators, judges, and the public to conclude that sexual abuse of prisoners is less prevalent and serious than it really is.*"[26] (Emphasis supplied.)

41. The Commission explained further: "There is no reason to believe, however, that extremely low substantiation rates are attributable to a high number of false allegations. There is very limited research on false reporting and no consensus on rates. The more rigorous studies of false reporting in the community (as opposed to in confinement) suggest that rates might range from 2 to 8 percent. Certainly, there are motivations and rewards for falsely reporting sexual abuse in a correctional facility that have no parallel in the community. At the same time, the real risks associated with reporting even genuine sexual abuse are a strong disincentive to fabricating allegations."[27]

---

[21] *Sexual Violence in the Texas Prison System*, Austin, Fabelo, et. al., National Institute of Justice, 2006.
[22] PREA Commission Report, Ch. 5, p. 117.
[23] *Sexual Victimization Reported by Adult Correctional Authorities, 2007–2008*, NCJ 231172, January 2011.
[24] *PREA Data Collection Activities*, 2014, NCJ 245694, May 2014.
[25] Unsubstantiated allegation means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred. Substantiated allegation means an allegation that was investigated and determined to have occurred. Unfounded allegation means an allegation that was investigated and determined not to have occurred. 28 C.F.R. Part 115, § 115.5.
[26] PREA Commission Report, Ch. 5, p. 118.
[27] *Id.*

### *There are extraordinary disincentives to reporting these crimes*

42. Courts have long recognized the underreporting of rapes and sexual assaults within prisons. *See, e.g., United States v. Bailey,* 444 U.S. 394, 426 n. 6 (1980) (Blackmun, J. dissenting) (If a kid who is raped tells the guards, "his life isn't worth a nickel"); *Martin v. White,* 742 F.2d 469, 473 (8th Cir.1984) (Statistics on inmate assaults reflect "merely the tip of the iceberg as many violent assaults never find their way into the record books."); *Doe v. District of Columbia,* 701 F.2d 948, 966 (D.C.Cir.1983) (Edwards, J., separate statement); *State v. Green,* 470 S.W.2d 565, 569 (Mo.1971) (dissenting opinion) *cert. denied* 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972) (Life of inmate of Missouri Training Center for Men who reports a rape not worth "a plugged nickel".) *LaMarca v. Turner,* 662 F. Supp. 647, 686 fn. 32 (S.D. Fla. 1987).

43. Correction officials nationwide have historically been reluctant to recognize prison rape.[28] Commentators have noted that officials have a "vested interest in underrepresenting the occurrence of rape."[29] In a 2005 study, states reported zero or little sexual abuse even while under investigation for ongoing sexual violence. Smith, Brenda V., *The Prison Rape Elimination Act: Implementation and Unresolved Issues,* Criminal Law Brief 3, no. 2 (2008), p.10-18. ("Several of the states reporting no complaints or low complaints were involved in ongoing public investigations of sexual violence in their facilities.") Smith notes that correctional surveys and inmate surveys have vastly differed: "correctional authorities reported 6,528 cases of sexual violence in 2006, whereas one year later, in 2007, inmates reported 189,400 cases." *Id.*

44. An example of reluctance to refer cases to prosecutors can be found in the notable Missouri case *Butler v. Dowd,* where a corrections official "testified that he had read approximately 100 reports of sexual assaults at [the facility] over a three-year period ... however, that Dowd had never referred a case of sexual assault for prosecution and had referred only a very few cases for investigation." *Butler v. Dowd,* 979 F.2d 661, 667 (8th Cir. Mo. 1992).

---

[28] PREA was meant to create rules that would prevent officials from ignoring the problem any longer. *Rape in the American Prison,* Maurice Chammah, THE ATLANTIC, February 25, 2015. But PREA's goals have not yet been realized nationally, *Id.,* and New York City DOC has not yet even completed a review of its jails for PREA compliance, which will precede any attempt at compliance. Testimony of Commissioner Ponte at the Board of Correction hearing on June 9, 2015, available at http://www.nyc.gov/html/boc/html/meetings/2013_Minutes.shtml
[29] I. Bennett Capers, *Real Rape Too,* 99 Cal. L. Rev. 1259, 1270 (2011).

13

45.  New York City appears to have a similar record in 2014. According to records my office received: the health service sent 116 allegations of sexual abuse to DOC that year, 47 of which involved rape or other penetration, and 20 of which involved masturbation.[30] In 61 of the total allegations a DOC staff person was the perpetrator, and 20 of those cases involved a reported use of force by the officer.[31] It is unknown how many were substantiated by DOC[32], and according to DOC's Compstat report, zero appear to have been referred to the New York City Police Department (NYPD) or District Attorney for prosecution.

46.  This slim record on prosecution does not escape the attention of inmates. Advocates and formerly incarcerated women have reported to my office that reporting this abuse within the jail is considered a futile gesture by many women. The fear of retaliation is strong, and there is little faith among these women that staff will be punished. This perception impedes reporting.

47.  The particular vulnerabilities of our jail population may also contribute to under-reporting. Under the criminal law, sexual relations between staff and inmates are statutory rape because the law recognizes that there is no possibility of real consent by the inmate in such a power imbalance. However, not every inmate may have the same insight. According to 2014 data provided by DOHMH, 19.8% of the inmates reporting sexual abuse have a Serious Mental Illness (SMI) designation, 74.1% have a diagnosis of mental illness (which can include depression or Post Traumatic Stress Disorder), and only 6% have no history of mental illness. Moreover, many of the women detained in our jails have histories of trauma before they enter jail. The DOJ Bureau of Justice Assistance found in a national study that 37% of women in prison had a history of childhood sexual abuse.[33] This is a vulnerable population which may not readily report sexual abuse.

---

[30] If promptly report to the authorities, there is the possibility of corroboration with physical evidence.

[31] Use of Force (UOF) is reported within DOC and tracked as "A" if there is a serious injury or blow to the head, "B" if there is a less serious injury that needs medical attention, and "C" if there is no injury (for instance the use of pepper spray necessitating an eye wash.) See, DOC Directive 5006-C dated 1/31/2008 and Teletype Order HG-01519-0 dated June 29, 2011.

[32] The average number substantiated by DOC in the preceding seven years was 1.6 of all types of complaints, not limited to staff-on-inmate complaints.

[33] The number jumps to 60% for women with an SMI designation. *Women's Pathways to Jail: Examining Mental Health, Trauma, and Substance Use*, BJA Policy Brief, by Shannon M. Lynch, Ph.D., Idaho State University; Dana D. DeHart, Ph.D., University of South Carolina; Joanne Belknap, Ph.D., University of Colorado; Bonnie L. Green, Ph.D., Georgetown University, March 2013.

48. For these reasons, the high level of sexual abuse allegations coupled with a very low rate of substantiated cases in our NYC jails is troubling.

49. As noted above, DOC did list eleven total substantiated cases in their data from 2010-2013. (DOC does not delineate between staff and inmates as abusers in the provided data, so we cannot discern whether *any* claims of staff-on-inmate abuse were substantiated.) In an attempt to obtain an accurate count of substantiation, my office reviewed records of the NYC Office of Administrative Trials and Hearings (OATH). We examined records from 2010-2013, searching for any Correction Officers who had been disciplined for sexual abuse of an inmate on the job.[34] We found none.

50. Numerous women are affected by sexual misconduct and abuse each year in our city jails. Much like a jail suicide, this should simply never happen. It is unacceptable for women to come out of our jails more broken than when they entered, and we must work to make "zero tolerance" a reality.

Letitia James
Public Advocate for the City of New York

---

[34] We did find two cases where female corrections officers were punished for "undue familiarity", but upon examination of the facts of the cases, neither of them involved sexual conduct. E.g., 2013 NY OATH LEXIS 314 (NY OATH 2013)(Termination: Correction officer failed to notify DOC about a pre-existing and on-going relationship with an inmate, brought her cell phone on post to speak with the inmate, engaged in unauthorized financial dealings with the inmate, and discussed official business with the inmate), 2010 NY OATH LEXIS 384 (NY OATH 2010)(Suspension: Correction officer accepted an earphone from an inmate, listened to music on it, and was dancing to the music in front of inmates while on duty).